# EXHIBIT A

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
Andrew J. Obergfell (*pro hac vice* forthcoming)
Matthew A. Girardi (*pro hac vice* forthcoming)
Julian C. Diamond (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: pfraietta@bursor.com
        aobergfell@bursor.com
        mgirardi@bursor.com
        jdiamond@bursor.com

*Attorneys for Plaintiff*

**ELECTRONICALLY FILED**
Superior Court of California
County of Marin
**05/02/2025**
James M. Kim, Clerk of the Court
By: J. Chen, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF MARIN

| | |
|---|---|
| JOSHUA FOLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GRAVY ANALYTICS, INC., GAMELOFT, INC., GAMELOFT SE, and IMANGI STUDIOS, LLC,<br><br>Defendants. | Case No. CV0006161<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Joshua Foley ("Plaintiff"), by and through his attorneys, make the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge, against Defendants Gravy Analytics, Inc. ("Gravy Analytics"), Gameloft, Inc., Gameloft SE (Gameloft, Inc. and Gameloft SE are collectively referred to as "Gameloft"), and Imangi Studios, LLC ("Imangi") (collectively, "Defendants").

## NATURE OF THE ACTION

1. This is a class action arising from: (1) Defendant Gravy Analytics' unlawful interception, wiretapping, or monitoring of personally identifying information ("PII"), including geolocation data, during the real-time bidding ("RTB") process occurring on Defendants Gameloft's and Imangi's mobile applications ("the Apps"); and (2) Defendants Gameloft's and Imangi's monetization of that selfsame PII, including geolocation data, without adequate disclosure to its users.

2. Defendant Gravy Analytics is a location intelligence and insights company that obtains and analyzes consumer location data from third party suppliers. These suppliers often amass consumer data from the mobile advertising marketplace, or from smartphone apps downloaded onto consumers' mobile devices.

3. Defendant Gameloft is a video game company that develops and publishes games for mobile devices. According to Gameloft, there are over one million Gameloft games downloaded every day.[1] Gameloft automatically collects both general geolocation information and precise geolocation information (GPS).

4. However, unbeknownst to Gameloft users, Gameloft, through popular game applications such as Minion Rush: Running Game, has been selling users' locational data to data brokers who sell that data to virtually anyone who wants to buy it.

5. Defendant Gravy Analytics has purchased or obtained Defendant Gamesoft's users' data through these transactions.

---

[1] https://www.gameloft.com/about-us (last visited 5/1/25).

1         6.     Alternatively, Gameloft has left its advertising processes, including its RTB process,

2    open to third parties like Defendant Gravy Analytics, who were able to monitor, access, or acquire

3    PII and geolocation data from Gameloft's users.

4         7.     Defendant Imangi is a video game company that develops and publishes games for

5    mobile devices.

6         8.     Defendant Imangi owns multiple apps, including but not limited to the Temple Run

7    App, a mobile game available on both the Apple App Store and the Google Play Store. Imangi

8    Studios also owns the Temple Run 2 app, another mobile game in the same franchise as Temple

9    Run.

10        9.     Imangi collects location information.

11        10.    However, unbeknownst to Imangi users, Imangi has been selling users' locational

12   data to data brokers who sell that data to virtually anyone who wants to buy it. Defendant Gravy

13   Analytics has purchased or obtained Defendant Imangi users' data through these transactions.

14        11.    Alternatively, Imangi has left its advertising processes, including its RTB process,

15   open to third parties like Defendant Gravy Analytics, who were able to monitor, access, or acquire

16   PII and geolocation data from Temple Run App users, among other Imangi applications.

17        12.    In December 2024, Gravy Analytics was sued by the Federal Trade Commission for

18   unlawfully tracking and selling consumers' location data, including data that could be used to track

19   consumers to sensitive locations such as places of religious worship, domestic abuse shelters,

20   medical facilities, and homeless shelters. The suit resulted in an order forbidding Gravy Analytics

21   from selling, licensing, transferring, sharing, disclosing, or otherwise using sensitive geolocation

22   data.[2]

23        13.    Specifically, this action arises from Defendant Gravy Analytics' collection and

24   surveillance of PII and geolocation data from Defendants Gameloft and Imangi during the RTB

25   process. This action equally arises from Defendants Gameloft and Imangi's sale, transfer or

26   distribution of its users' PII, including geolocation data, to Gravy Analytics without users' consent.

27

28     [2] https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticsorder.pdf

---

14. Under the California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798.140, *et seq.* ("CCPA"), "A business that controls the collection of a consumer's personal information shall, at or before the point of collection, inform consumers of… The categories of personal information to be collected and the purposes for which the categories of personal information are collected or used and whether that information is sold or shared. A business shall not collect additional categories of personal information or use personal information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice consistent with this section." CCPA § 1798.100(a)(1).

15. In addition, "A business that controls the collection of a consumer's personal information shall, at or before the point of collection, inform consumers of…The length of time the business intends to retain each category of personal information, including sensitive personal information, or if that is not possible, the criteria used to determine that period provided that a business shall not retain a consumer's personal information or sensitive personal information for each disclosed purpose for which the personal information was collected for longer than is reasonably necessary for that disclosed purpose." CCPA § 1798.100(a)(3).

16. Under the CCPA, "Personal information" means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. Personal information includes, but is not limited to information that identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household. *See* CCPA § 1798.140 (v)(1). That specifically includes "Geolocation data." *Id.* § (v)(1)(G).

17. The PII and geolocation data at issue in this case are clearly "Personal Information" under the CCPA. Thus, Plaintiff and putative class members would reasonably have expected to be notified, as required by the CCPA, if Defendants intended to sell or otherwise make available users' locational data to data brokers.

18. Yet Defendants Gameloft and Imangi never gave the requisite notice outlined above. Indeed, Plaintiff and putative class members were wholly unaware of Defendants Gameloft

1   and Imangi's sale and transmission of users' data through the RTB process. They were likewise

2   wholly unaware of Gravy Analytics' monitoring of and use of the same.

3        19.    Due to Defendants Gameloft and Imangi's disclosure, sale or transfer of users' data

4   to Gravy Analytics and Defendant Gravy Analytics' monitoring of and use of the same during the

5   RTB process, Plaintiff's and Class members' PII and geolocation data was unlawfully intercepted,

6   disclosed, and monetized without consent.

7        20.    The allegations here are made more invasive by the relationship between

8   Defendants Gameloft and Imangi and Defendant Gravy Analytics. Defendant Gravy Analytics is a

9   registered data broker in California who focuses on "location insights," or the tracking of users'

10   physical movements using geolocation data. The purpose of the relationship is to enrich

11   Defendants through the sharing, curation or monetization of user data, which (1) third parties like

12   Defendant Gravy Analytics can buy or monitor for their own use and (2) advertisers use when

13   targeting advertisements through purchased ad space on Defendants Gameloft and Imangi's Apps.

14        21.    When users' geolocation data is collected by parties like Defendant Gravy Analytics

15   to better understand users' movements, habits, and purchasing behavior, these users are then

16   offered up for sale with all this collated information to interested advertisers through processes

17   such as real-time bidding. Advertisers can then better target users of the Apps based on these

18   attributes and will therefore pay Defendants Gameloft and Imangi more to show advertisements to

19   the users of the Apps. All of this enriches Defendants Gameloft and Imangi through advertising

20   revenue, and makes Defendant Gravy Analytics' location insight services more valuable while

21   stripping Plaintiff and Class Members of their anonymity and privacy in the process.

22        22.    Plaintiff brings this action on behalf of himself and all affected consumers in

23   California whose PII or geolocation data, as collected by Defendants Gameloft and Imangi was

24   intercepted and disclosed to Defendant Gravy Analytics during the RTB process. Plaintiff seeks,

25   for himself and the Class, injunctive relief, actual and other economic damages, consequential

26   damages, nominal damages or statutory damages, punitive damages, attorney's fees, litigation

27   expenses, and costs.

28

23. **Plaintiff Joshua Foley** is a resident of Novato, California. Plaintiff downloaded and used Defendant Gameloft's Minion Rush: Running Game which, upon information and belief, contained geolocation data tracking technology. Plaintiff also downloaded and used Defendant Imangi's Temple Run, Temple Run 2: Endless Escape, and Temple Run: Oz applications (collectively the "Temple Run Apps") which, upon information and belief, contained geolocation data tracking technology.

24. Plaintiff Foley used the Minion Rush: Running Game and the Temple Run Apps for years, including in his workplace and home, among other locations. Plaintiff Foley most recently used the Apps in or around December 2024.

25. While he had the Apps on his phone, Plaintiff Rogers routinely traveled with his phone to various locations—including his home, work, medical appointments, religious services, and other places he considers sensitive and private.

26. At the time Plaintiff Foley downloaded the Apps, he believed that the Apps would not transfer his personal or geolocation data to another entity for the purposes of selling said data or expose his personal or geolocation data through an unsupervised bidding process.

27. However, that was not the case. Defendants Gameloft and Imangi's Apps sent or exposed personal or geolocation data to Defendant Gravy Analytics when Plaintiff Foley used the Apps. During that entire time, the Apps tracked the geolocation of Plaintiff Foley. In turn, Defendants Gameloft and Imangi tracked Plaintiff Foley's geolocation in California, and then monetized, sold or exposed that data during the RTB process to companies such as Defendant Gravy Analytics. Plaintiff Foley suffered his primary injury in California.

28. During the time Plaintiff Foley used the Apps, Defendants Gameloft and Imangi took Plaintiff Foley's geolocation data from the Apps and then sold, monetized, or unguardedly exposed Plaintiff Foley's personal or geolocation data to other third parties, such as Defendant Gravy Analytics.

29. Plaintiff Foley has not consented to having his personal or geolocation data monetized, sold or exposed to third parties for valuable consideration. If Plaintiff Foley had been

1   aware that Defendants Gameloft and Imangi would receive, monetize and/or expose his

2   geolocation data to third parties such as Defendant Gravy Analytics during the RTB process,

3   Plaintiff Foley would not have used the Apps.

        30.    **Defendant Gravy Analytics, Inc.**, is a Delaware corporation with its principal

5   office or place of business at 44679 Endicott Dr Suite 300, Ashburn, VA 20147.

        31.    Defendant Gravy Analytics at one point claimed to collect and process more than 17

7   billion signals from approximately a billion devices daily. Defendant Gravy Analytics obtained

8   consumer location data from other data suppliers, some of whom themselves obtained the location

9   data from other data suppliers, the mobile advertising marketplace, or mobile applications.

        32.    The list of data brokers and third-party suppliers who have sold or otherwise sent

11   geolocation and PII to Gravy Analytics is not public or available to Plaintiff but is known to Gravy

12   Analytics.

        33.    The means through which Gravy Analytics obtains location data is further

14   concealed by its use of third-party applications and data sources.

        34.    Gravy Analytics obtained this location data from third party suppliers in part to

16   compile massive troves of valuable customer geolocation data that it could then disclose to other

17   third parties—in this case, commercial customers—for a price.

        35.    Defendant Gravy Analytics would deliver bulk geolocation data, gleaned from third

19   parties such as Defendants Gameloft and Imangi, to its customers through file transfers, or through

20   providing access through an Application Programming Interface ("API"). In addition to

21   continuously sending updates with new consumer data to its customers, Gravy Analytics used to

22   offer its customers the opportunity to search and receive at least three years of historical data.

        36.    **Defendant Gameloft, Inc.** is now and at all times herein mentioned, is a

24   corporation organized and existing under the laws of the State of Delaware and registered as a

25   foreign corporation in California with its principal business office located in Paris, France.

26   Defendant Gameloft, Inc. maintains a mailing address at 200 Hudson Street, New York, NY

27   10013.

28

1      37.    **Defendant Gameloft SE** is now and at all times herein mentioned is a public

2      corporation organized and existing under the laws of France with its principal business office

3      located at 14 Rue Auber, 75009 Paris, France.

4      38.    Upon information and belief, Gameloft obtains personal information and location

5      information on millions of active users each month.

6      39.    Gameloft displays ads on the Minion Rush: Running Game and other applications it

7      offers.

8      40.    Plaintiff's geolocation has been monetized, sold or exposed by Gameloft to third

9      parties such as Defendant Gravy Analytics.

10     41.    In the alternative, Gameloft has allowed for real-time bidding processes—explained

11     further below—that give advertisers and third parties unprotected access to its App users' personal

12     information and geolocation data.

13     42.    The list of advertisers and companies who have access to Gameloft's RTB process

14     for buying ad space on its App is not public or available to Plaintiff but is known to Gameloft.

15     43.    **Defendant Imangi Studios, LLC,** is a North Carolina limited liability company

16     with its principal office or place of business at 4601 Six Forks Rd, Suite 121, Raleigh, NC 27609.

17     44.    Imangi obtains personal information and location information on hundreds of

18     thousands of active users each month. [3]

19     45.    Imangi displays ads on its Temple Run App if users do not purchase the "Ad

20     Removal" option for $1.99. [4]  Plaintiff used the free version of the Temple Run application. Imangi

21     uses ad serving technologies that collect and use information about users so it can serve advertising

22     to players and track results and measure effectiveness.

23     46.    Plaintiff's geolocation has been monetized, sold or exposed by Defendant Imangi to

24     third parties such as Defendant Gravy Analytics.

25

26

27     [3] Top 5 Apple Arcade Games Performance in the US Q2 2024, https://sensortower.com/blog/2024-q2-unified-top-5-apple%20arcade%20games-units-us-642fb3fce1714cfff150099b

28     [4] Temple Run, App Store Preview, https://apps.apple.com/us/app/temple-run/id420009108

47.     In the alternative, Defendant Imangi has allowed for real-time bidding processes—explained further below—that give advertisers and third parties unprotected access to its application users' personal information and geolocation data.

48.     The list of advertisers and companies who have access to Imangi's RTB process for buying ad space on its applications is not public or available to Plaintiff but is known to Imangi.

49.     Plaintiff did not consent to having his personal or geolocation data sold to or monetized by specific third parties such as Defendant Gravy Analytics for valuable consideration. If Plaintiff had been aware that Defendants Gameloft and Imangi were selling his geolocation data to third parties such as Defendant Gravy Analytics, Plaintiff would not have used the Apps.

50.     Plaintiff did not consent to having his personal data and geolocation data monitored and acquired during the RTB process by third parties like Defendant Gravy Analytics. If Plaintiff had been aware that Defendants Gameloft and Imangi were giving third parties such as Defendant Gravy Analytics access to his data through the RTB process, Plaintiff would not have used the Apps.

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution and Cal. Code Civ. Proc. § 410.10. This action is brought as a class action on behalf of Plaintiff and Class Members pursuant to Cal. Code Civ. Proc. § 382.

52.     This Court has personal jurisdiction over Defendants because they conduct business in this State and a substantial portion of the events giving rise to Plaintiff's causes of action occurred in California.

53.     Venue is proper in this District because the conduct alleged in this Complaint occurred in this County.

## FACTUAL ALLEGATIONS

**A.** **Data Brokers and Real-Time Bidding: The Information Economy**

54.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[5] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. (Cal. Civ. Code § 1798.99.80(c).)

55.    Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a), which Gravy Analytics[6] does.

56.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[7] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[8]

57.    For instance, a NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only

---

[5] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 7 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

[6] DATA BROKER REGISTRATION FOR GRAVY ANALYTICS, INC., https://oag.ca.gov/data-broker/registration/185798.

[7] SHERMAN, *supra*, at 2.

[8] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

---

what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[9]

58. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[10] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[11]

59. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[12]

60. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-

---

[9] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[10] SHERMAN, *supra*, at 1.

[11] *Id.*

[12] *Id.* at 9.

commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[13]

61. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[14]

**Figure 1:**



---

[13] *Id.*

[14] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

62. Data brokers like Defendant Gravy Analytics can compile such wide swaths of information in part by collecting users' geolocation data, which are used by Defendant Gravy Analytics to track users across the Internet.[15] These data brokers also share their information amongst one another and other entities to create even more replete user profiles.

63. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[16]

64. In short, by collecting or purchasing PII and geolocation from companies like Defendants Gameloft and Imangi, data brokers like Gravy Analytics can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.

**B.** **Real-Time Bidding**

65. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[17]

66. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[18] And an Advertising Exchange allows advertisers and publishers to use the

---

[15] *Id.* at 11.

[16] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[17] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[18] Geoghegan, *supra*.

same technological platform, services, and methods, and "speak the same language" to exchange data, set prices, and ultimately serve an ad.

67. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

68. The RTB process works as follows:

> After a user loads a website or app [like Defendants Gameloft and Imangi Apps], an SSP will send user data to Advertising Exchanges ... The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[19]

**Figure 2:**



---

[19] Geoghegan, *supra*; see also REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

69. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about, for example, Defendants Gameloft and Imangi's Apps users to procure the greatest interest from advertisers and the highest bids.

70. In other words, an SSP can solicit the highest bids for ads displayed to Defendants Gameloft and Imangi's Apps users by identifying and de-anonymizing those App users. This includes users' IP addresses or geolocation data, which are used in conjunction with other PII to match users in data brokers' repositories. If there is a match between Defendants Gameloft and Imangi's Apps users and the profiles previously collated by data brokers, then Defendants Gameloft and Imangi can solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

71. This naturally enriches Defendants Gameloft and Imangi, as its users have now become more valuable. It also enriches Defendant Gravy Analytics, as the data of Apps users can be folded into the user data that Gravy Analytics already owns, enhancing the data set it thereafter sells to other customers.

**C.** **Gameloft and Imangi Collect Sensitive Information From App Users On Millions Of Mobile Devices And Monetize It For Third Parties Like Gravy Analytics.**

72. Defendant Gameloft is a video game company that develops and publishes games for mobile devices such as Minion Rush: Running Game, among others. According to Gameloft, there are over one million Gameloft games downloaded every day.[20] Gameloft automatically collects both general geolocation information and precise geolocation information (GPS). In addition to geolocation data, Gameloft also collects a user's name, email address, age, gender, birthdate, information about interactions with other players, IP address and other device identifiers (such as device ID and advertising ID).

73. Gameloft monetizes consumers' location data and sells, distributes or otherwise transfers it to third parties. Gameloft fails to take necessary precautions to ensure that location

---

[20] https://www.gameloft.com/about-us (last visited 5/1/25).

histories cannot be traced back to individuals. Gameloft does not properly make efforts to fuzz, hash, aggregate, or reduce the precision of the location data to preserve privacy.

74.     Researchers have repeatedly demonstrated how location data of the type that Defendant Gameloft monetizes, that has been "anonymized," can easily be connected to the people from whom it came.

75.     This is by design, since if Gameloft had taken the necessary precautions to properly anonymize the data, the data would be less valuable to third parties.

76.     The personal information Gameloft shares include identifiers and protected classification characteristics under California or federal law.

77.     Gameloft fails to notify consumers that their location data will be sold to location intelligence and insights companies such as Defendant Gravy Analytics for valuable consideration.

78.     In the alternative, Gameloft shared its users' location data with Defendant Gravy Analytics through a process known as "real-time bidding" ("RTB"). RTB is a millisecond-short auction that determines which advertisers get to deliver their ad to users.[21] Here, the RTB process determines which advertisers' content appears on Gameloft's Minion Rush: Running Game application, among others.

79.     But the RTB process is not open only to advertisers. Companies and data brokers monitoring these auctions also gain access to users' "bidstream" data. Data brokers, including Defendant Gravy Analytics, can combine that "bidstream" information with other data about those individuals from other sources to paint a detailed picture of someone's habits and movements.[22]

80.     When Gameloft allows third parties access to user data to serve targeted advertisements during the RTB process, user data is even provided to those entities who do not actually serve an advertisement on a consumer (such as Defendant Gravy Analytics). This greatly diminishes the ability of users to control their personal information.

---

[21] TechCrunch, "A breach of Gravy Analytics' huge trove of location data threatens the privacy of millions," https://techcrunch.com/2025/01/13/gravy-analytics-data-broker-breach-trove-of-location-data-threatens-privacy-millions/.

[22] *Id.*

81.     The Temple Run Apps are mobile video game applications in the endless runner genre. Users can access Temple Run by downloading Imangi's proprietary Temple Run application from the Apple App Store or the Android Play Store. Imangi's Temple Run application has been downloaded at least 730 million times, and its Temple Run 2 app has been downloaded at least 850 million times.[23] As recently as September 2024, Temple Run 2 was downloaded from the Play Store over 5 million times.

82.     Imangi collects consumer data through the Temple Run Apps and other applications, including identifiers (such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number and/or other similar identifiers), protected classification characteristics, commercial information, Internet and other similar network and activity (such as browsing history, search history, information on a consumer's interaction with a website, application, or advertisement), professional and employment-related information and inferences drawn from other personal information that are associated with its users. Imangi Studios also collects location information about its users.

83.     Imangi monetizes consumers' location data and sells, distributes or otherwise transfers it to third parties. Imangi employs ad serving technologies that use cookies, clear GIFs, web beacons, tracking pixels, and other similar technologies like identifiers to deliver offers to users. Moreover, these technologies can sync or connect behavior across different mobile apps, devices, and websites. The ads can be tailored to users' interests.

84.     The personal information Imangi shares include identifiers, protected classification characteristics under California or federal law, commercial information, Internet or other similar network activity, inferences drawn from other personal information and equipment information.

85.     Imangi fails to take necessary precautions to ensure that location histories cannot be traced back to individuals.

---

[23] Andrea Knezovic, *100 Most Downloaded Mobile Games of All Time: 2025 Rankings*, Udonis, https://www.blog.udonis.co/mobile-marketing/mobile-games/most-downloaded-mobile-games

86. Defendant Imangi does not properly make efforts to fuzz, hash, aggregate, or reduce the precision of the location data to preserve privacy.

87. Researchers have repeatedly demonstrated how location data of the type that Defendant Imangi monetizes, that has been "anonymized," can easily be connected to the people from whom it came.

88. This is by design, since if Defendant Imangi had taken the necessary precautions to properly anonymize the data, the data would be less valuable to third parties.

89. Instead of properly obfuscating the data, Defendant Imangi relies on its customers and data partners to voluntarily obfuscate the purchased data based on their specific applications.

90. Advertisers, government agencies, and investors are willing to spend hundreds of thousands of dollars for location data and the insights that can be derived from it.

91. Defendant Imangi's reliance on its data partners to voluntarily obfuscate the data that it monetizes, transfers or sells is not reasonable as many of these data partners, such as Defendant Gravy Analytics, have themselves faced controversy over how they handle data and privacy.

92. Imangi fails to notify consumers that their location data will be sold to location intelligence and insights companies such as Defendant Gravy Analytics for valuable consideration.

93. In the alternative, Defendant Imangi shared its users' location data with Defendant Gravy Analytics through a process known as "real-time bidding" ("RTB"). RTB is a millisecond-short auction that determines which advertisers get to deliver their ad to users.[24] Here, the RTB process determines which advertisers' content appears on Imangi Studios' Temple Run Apps.

94. During RTB, bidding advertisers can access users' device information, including the device's make and model type, its IP address (a known proxy for a person's location), and oftentimes more precise location data if granted by the app user.

---

[24] TechCrunch, "A breach of Gravy Analytics' huge trove of location data threatens the privacy of millions," https://techcrunch.com/2025/01/13/gravy-analytics-data-broker-breach-trove-of-location-data-threatens-privacy-millions/.

95.     But the RTB process is not open only to advertisers. Companies and data brokers monitoring these auctions also gain access to users' "bidstream" data. Data brokers, including Defendant Gravy Analytics, can combine that "bidstream" information with other data about those individuals from other sources to paint a detailed picture of someone's habits and movements.

96.     As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)     "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [i.e., website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)     "send[ing] sensitive data across geographic borders."

(c)     sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[25]

97.     The last point bears additional emphasis, as it establishes that when Defendant Imangi allows third parties access to user data to serve targeted advertisements during the RTB process, user data is even provided to those entities who do not actually serve an advertisement on a consumer (such as Defendant Gravy Analytics). This greatly diminishes the ability of users to control their personal information.

98.     Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[26]

---

[25] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, Federal Trade Commission (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[26] Sara Geoghegan, *What is Real Time Bidding?* ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

99.     All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one that statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

100.     To summarize the preceding allegations, website and mobile application operators monetize their platforms through the user of real-time bidding. Through RTB, consumer information is provided to both advertisers who are interested in showing advertisements to particular consumers, and third parties who are allowed to monitor the RTB process. Advertisers then "bid" to show consumers an advertisement, with the winning bidder ultimately having their advertisement displayed to consumers. However, all interested advertisers and third parties with access receive consumers' information regardless.

101.     The value of those users is enriched by partnering with data brokers, data management platforms, and advertising exchanges, which enable those entities involved in RTB to link the information said entities collect from consumers on a particular website or app (such as Defendant Gameloft's and Imangi's Apps) with Defendant Gravy Analytics' vast repository of information and user profiles that it maintains on billions of consumers. This enriches the value of a website or app's user base because advertisers have a wider swath of information to use to target relevant consumers, meaning advertisers will pay more money to show users an advertisement on that website or application.

102.     Neither Gameloft nor Imangi has informed users that the Apps, which collects users' personal data (including their location data), do not protect their data such that it is available to location intelligence and insights companies such as Defendant Gravy Analytics through monetization or through RTB.

**D.** **Gameloft and Imangi's Data, Once Monetized and Sold to or Acquired by Gravy Analytics, Could Be Used to Identify People and Track Them to Sensitive Locations**

103. Precise geolocation data, such as the data monetized by Defendants Gameloft and Imangi and sold or transferred to Defendant Gravy Analytics, may be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters.

104. When collected across time, location data can reveal every aspect of a consumer's life.

105. Defendant Gravy Analytics' business model, prior to the FTC's lawsuit, was to amass and sell raw location data from third party suppliers like Gameloft and Imangi. This raw location data is used to track consumers' movements to glean insights into consumers' private lives. Defendant Gravy Analytics used this data to identify consumers based on attributes and behaviors the data reveals, including sensitive and personal attributes and behaviors, and then disclosed this information to third parties.

106. These location signals, gathered from consumers' mobile phones, identify consumers' precise geolocation by latitude and longitude coordinates at the time the signal was gathered. Each location signal is associated with a Mobile Advertising ID ("MAID"), an alphanumeric identifier assigned to each user's unique mobile device. This unique identifier is assigned to a consumer's mobile phone to assist marketers in advertising to consumers. These data signals would be collected from a mobile device's GPS coordinates and, at times, augmented by other signals, such as WiFi.

107. The location data that was collected, used, and sold by Defendant Gravy Analytics was sufficient to identify individual consumers, and was not anonymized. Persistent identifiers like MAIDs are personally identifiable information. Defendant Gravy Analytics' geolocation data, combined with the mobile device's MAID or other persistent identifiers, identifies the mobile device's user or owner.

108.    Geolocation data collected by Defendants Gameloft and Imangi through its Apps and thereafter collected, monitored, used or purchased by Defendant Gravy Analytics was part of a data breach that revealed "more than 30 million location data points," including "devices located at The White House in Washington, D.C.; the Kremlin in Moscow; Vatican City; and military bases around the world." Data disclosed in that same Data Breach was sufficient to track "a person as they traveled from New York to their home in Tennessee."[27]

109.    In December 2018, *The New York Times* published an article entitled, "Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret."[28] The article discussed how even supposedly anonymized location tracking can reveal individual identity through, for example, a consumer's work commute or time spent regularly at a home address. The article discussed how such tracking applications gather private information, noting one woman's concerns about the tracking of her visit for a medical procedure, a Weight Watchers meeting, and a stay at an ex-boyfriend's home. The article noted that "explanations people see when prompted to give permission are often incomplete or misleading" and do "not mention that the data will be shared and sold."

110.    As *The New York Times* reported in a September 2020 article entitled, "How Mobile Phones Became a Privacy Battleground—and How to Protect Yourself," phone users do not understand that their data is being tracked[29]:

> [I]t [is] nearly impossible for phone owners to track where their data goes or how it gets used, let alone prevent that data from being shared in the first place. . . . [T]he industry has no standards to follow, so it's difficult for everyone to figure out what is and isn't possible on any given device. What phone owners have instead are sometimes-complicated menus full of permissions that are buried

---

[27] TechCrunch, "A breach of Gravy Analytics' huge trove of location data threatens the privacy of millions," https://techcrunch.com/2025/01/13/gravy-analytics-data-broker-breach-trove-of-location-data-threatens-privacy-millions/.

[28] Jennifer Valentino-DeVries, et al., *Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret*, The New York Times (Dec. 10, 2018), https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-apps.html.

[29] Thorin Klosowski, *How Mobile Phones Became a Privacy Battleground-and How to Protect Yourself*, The New York Times Wirecutter (Sept. 29, 2022), https://www.nytimes.com/wirecutter/blog/protect-your-privacy-in-mobile-phones/.

deep within an operating system and rarely set up by default with their privacy in mind.

111. A private investigator was able to obtain consumer data from another data broker like Gravy Analytics: Babel Street. Like Gravy Analytics' technology, Babel Street's Local X "tool relies on the mobile advertising ID that Google and Apple assign to each phone to serve users targeted ads. Advertisers can then build a growing profile of information around that ID based on where it accesses services that deliver ads."[30]

112. But the nature of such tracking means that individuals are followed well beyond their shopping trip, actively tracking their whereabouts, including the most private moments of their lives:

> [T]he data . . . allowed a reporter to zoom in on the parking lot of an abortion clinic in Florida and observe more than 700 red dots, each representing a phone that had recently visited the clinic. Location X then allowed the reporter to trace the movements of one specific device.
>
> That device—and by extension, the person carrying it—began the journey in mid-June from a residence in Alabama. The person passed by a Lowe's Home Improvement store, drove on a highway, visited a church, crossed into Florida, and finally stopped at the clinic where the phone indicates the person stayed for two hours before leaving and returning to Alabama. The data tracked the phone as having visited the clinic only once.[31]

113. One advertising group previously used location data to target "abortion-minded" women with anti-choice advertising.[32]

[30] Emma Roth, *An investigation exposes data brokers using ads to help track almost any phone*, The Verge (Oct. 23, 2024), https://www.theverge.com/2024/10/23/24277679/atlas-privacy-babel-street-data-brokers-locate-x-tracking.

[31] Dan Goodin, *Location Tracking of phones is out of control. Here's how to fight back.*, Ars Technica (Oct. 23, 2024), https://arstechnica.com/information-technology/2024/10/phone-tracking-tool-lets-government-agencies-follow-your-every-move/.

[32] Sharona Coutts, *Anti-Choice Groups Use Smartphone Surveillance to Target 'Abortion-Minded Women' During Clinic Visits*, Rewire News Group (May 25, 2016), https://rewirenewsgroup.com/2016/05/25/anti-choice-groups-deploy-smartphone-surveillance-target-abortion-minded-women-clinic-visits/.

114.    While details about Defendants' data cache remain opaque and in its sole possession, Defendants undoubtedly collected consumers' precise, minute movements, to private locations, unrelated to any consented-to services.

115.    As a preliminary matter, geolocation information is sensitive data that necessarily reveals a consumer's identity. Geolocation coordinates together with timestamp data—exactly the type of data Defendants collect—can reveal a consumer's home address, work address, and any other location they visit.

116.    Indeed, researchers from MIT found that a small location data sample is sufficient to identify an individual. The researchers analyzed timestamped location data for 1.5 million individuals over 15 months and found that only four timestamped locations are sufficient to identify 95% of individuals. Given 11 data points, the researchers could identify all individuals in the study. The reason for the findings is obvious: individuals have unique movement patterns, and it is not likely that someone else will be in the same locations at four different times of the day.

117.    The researchers commented that an individual may be identified with less than four data points simply by exploiting irregularities in an individual's behavior.

118.    By collecting timestamped geolocation data, unique device identifiers, and device fingerprint data, bad actors can connect an ostensibly "anonymous" ID (such as a MAID or other unique device identifier) to an individual and then collect data on their interests and activities. These bad actors can then create a comprehensive consumer profile by combing through this data.

**E.    Defendants Gameloft and Imangi Monetize Class Members' Location Data, and Allowed Defendant Gravy Analytics to Access It During the RTB Process**

119.    Defendants Gameloft and Imangi collect a considerable amount of PII and geolocation data from users of the Apps.

120.    Because this PII and geolocation is sensitive data that poses "an incalculable risk to personal privacy," companies are responsible for safeguarding it appropriately. Companies' failure to uphold this responsibility can have legal consequences: the Federal Trade Commission announced that it would dedicate the "full scope of its legal authorities to protect consumers'

privacy" and would "vigorously enforce the law if we uncover illegal conduct that exploits Americans' location, health, or other sensitive data."[33]

121. Gameloft runs ads on the Minion Rush: Running Game application, among others. Imangi runs ads on the Temple Run Apps when users do not pay for "ad removal."[34]

122. As part of its advertising initiatives, upon information and belief, Gameloft and Imangi engage in or allow for a real-time bidding (RTB) process for placing ads on the Apps.

123. RTB is a split-second auction in which advertisers compete to display their ads to segments of an audience based on personal attributes like age, browsing habits and interests.[35] Any advertiser that bids, or any company that is given access to the auction, can see information about users of the website or app where the ads will be displayed.[36]

124. Defendants Gameloft and Imangi sort users into audience segments to which they can target advertising.

125. As part of the RTB process, Defendants Gameloft and Imangi make their advertising audience segments available on real-time bidding platforms. An advertiser using one of these platforms can select an advertising audience and identify the amount that it is willing to pay (that is, its bid) each time its ad appears on one of the Apps for a user that is a part of that audience.

126. The advertiser's ad will appear in the Apps on a particular device if it has the highest bid for that device.

127. Defendants Gameloft and Imangi receive revenue each time an advertiser uses one of its audiences in this process.

---

[33] Kristin Cohen, Federal Trade Commission, "Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data," (July 11, 2022).

[34] Temple Run, App Store Preview, https://apps.apple.com/us/app/temple-run/id420009108

[35] Martina Bretous, "Real-Time Bidding for Programmatic Ads — Here's How It Works," https://blog.hubspot.com/marketing/real-time-bidding

[36] TechCrunch, "A breach of Gravy Analytics' huge trove of location data threatens the privacy of millions," https://techcrunch.com/2025/01/13/gravy-analytics-data-broker-breach-trove-of-location-data-threatens-privacy-millions/.

128.    Defendants Gameloft and Imangi never notified Plaintiff and putative class members that it would be disclosing this Personal Information (as that term is defined under the CCPA) in this way.

129.    Defendants Gameloft and Imangi should have taken reasonable steps to obtain Plaintiff and putative class members' consent before monetizing their PII and geolocation data or disclosing it to third parties through the RTB process.

130.    Instead, Defendants Gameloft and Imangi enabled or allowed Defendant Gravy Analytics to surreptitiously access Plaintiff's and the Class's PII and geolocation during the RTB process in violation of the California Invasion of Privacy Act §§ 631-632.

131.    During the RTB process, Defendants also used a pen register as it is defined in California Penal Code Section 638.50(b) to track Plaintiff's and Class Members' location data and personal information.

132.    Defendants Gameloft and Imangi's disclosure of Plaintiff and the Class Members' data to Defendant Gravy Analytics is established by the inclusion of its App's name in a trove of hacked Gravy Analytics data, alongside tens of millions of mobile phone coordinates of devices inside the US, Russia, and Europe.[37]

## CLASS ALLEGATIONS

133.    ***Class Definition.*** Plaintiff brings this action on behalf of a classes of similarly situated individuals, defined as:

> All persons who reside in California whose data, including but not limited to their geolocation data, was collected by Defendant Gameloft and monetized, transmitted or exposed to Defendant Gravy Analytics through Defendant Gameloft's RTB process or through direct sale/sharing.

(the "Gameloft Class").

> All persons who reside in California whose data, including but not limited to their geolocation data, was collected by Defendant Imangi and monetized, transmitted or exposed to Defendant Gravy

---

[37] Joseph Cox, *Wired*, "Candy Crush, Tinder, MyFitnessPal: See the Thousands of Apps Hijacked to Spy on Your Location," https://www.wired.com/story/gravy-location-data-app-leak-rtb/

Analytics through Defendant Imangi's RTB process or through direct sale/sharing.

(the "Imangi Class") (the Gameloft Class and Imangi Class are collectively referred to as the "Class").

134.   Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

135.   Subject to additional information obtained through discovery, the foregoing class definition may be modified or narrowed by an amended complaint, or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

136.   ***Numerosity.*** Members of the Class ("Class Members") are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the millions. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

137.   ***Commonality and Predominance.*** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include but are not limited to:

(a)   Whether Defendants' acts and practices alleged herein constitute egregious breaches of social norms;

(b)   Whether Defendants acted intentionally in violating Plaintiff's and Class Members' privacy rights under the California Constitution or common law;

(c)   Whether Defendants violated CIPA section 638.51(a);

(d)   Whether Defendants obtained Plaintiff and Class Members' data using "pen registers" pursuant to Cal. Penal Code § 638.50(b);

1     (e)    Whether Defendants sought or obtained prior consent—express

2         or otherwise—from Plaintiff and the Class;

3     (f)    Whether Defendants sought or obtained a court order for its use

4         of pen registers;

5     (g)    Whether Plaintiff and members of the Class are entitled to actual

6         and/or statutory damages for the aforementioned violations.

7     138.    ***Typicality.*** The claims of the named Plaintiff are typical of the claims of the Class in

8 that the named Plaintiff's data was: (1) monetized by Defendants Gameloft and Imangi without his

9 consent; and (2) transmitted to Defendant Gravy Analytics through a direct sale or exposed to

10 Defendant Gravy Analytics during the RTB process.

11     139.    ***Adequacy.*** Plaintiff is an adequate representative of the Class because his interests

12 do not conflict with the interests of the Class Members he seeks to represent, he has retained

13 competent counsel experienced in prosecuting class actions, and he intends to prosecute this action

14 vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and

15 his counsel.

16     140.    ***Superiority.*** The class mechanism is superior to other available means for the fair

17 and efficient adjudication of the claims of Class Members. Each individual Class Member may

18 lack the resources to undergo the burden and expense of individual prosecution of the complex and

19 extensive litigation necessary to establish Defendants' liability. Individualized litigation increases

20 the delay and expense to all parties and multiplies the burden on the judicial system presented by

21 the complex legal and factual issues of this case. Individualized litigation also presents a potential

22 for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer

23 management difficulties and provides the benefits of single adjudication, economy of scale, and

24 comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment

25 of the liability issues will ensure that all claims and claimants are before this Court for consistent

26 adjudication of the liability issues.

27

28

46.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

47.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

48.    Plaintiff brings this claim pursuant to California law.

49.    To state a claim for intrusion upon seclusion "[Plaintiff] must possess a legally protected privacy interest … [Plaintiff's] expectations of privacy must be reasonable … [and Plaintiff] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc.* 47 Cal. 4th 272, 286-87 (2009).

141.    Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive information and geolocation data; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to use the Apps and visit physical locations or places without being subjected to highly intrusive surveillance and movement tracking at every turn.

142.    By conducting such widespread surveillance, Defendants intentionally invaded Plaintiff's and Class Members' privacy rights, as well as intruded upon Plaintiff's and Class Members' seclusion.

143.    Plaintiff and Class Members had a reasonable expectation that their personal information, geolocation data and personal activities, and other data would remain confidential.

144.    Plaintiff and Class Members did not and could not authorize Defendants to intercept data on every aspect of their activities.

145.    The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

(a)    Defendants engage in widespread data collection and interception of Plaintiff's and Class Members' App activity and geolocation data, thereby learning intimate details

of their daily lives and movements based on the massive amount of information collected about them.

        (b)    Defendants combine the information collected on the Apps with "bidstream" data gathered on individuals during the RTB process to create and/or build out user profiles.

        (c)    Based on the geolocation data collected by Defendants Gameloft and Imangi, Defendant Gravy Analytics creates or augments comprehensive profiles based on this data, which violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

        (d)    Defendant Gravy Analytics sells or discloses these profiles, which contain the data improperly collected and shared by Defendants Gameloft and Imangi about Plaintiff and Class Members, to an unknown numbers of advertisers and data brokers for use in the RTB process, which likewise violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

146.    Defendant Gravy Analytics amassment of electronic information reflecting all aspects of Plaintiff's and Class Members' movements into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

147.    In addition, those profiles are and can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details about their movements and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

148.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under common law.

## COUNT II
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631(a)

149. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

150. Plaintiff brings this Count individually and on behalf of the members of the Class against Defendants.

151. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

1    152. Defendant Gravy Analytics' electronic monitoring of the RTB process constitutes a

2    "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at

3    issue here.

4    153. Defendant Gravy Analytics is a "separate legal entity that offers [a] 'software-as-a-

5    service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal.

6    2021). Further, Defendant Gravy Analytics had the capability to use the wiretapped information for

7    its own purposes. Accordingly, Defendant Gravy Analytics was a third party to any communication

8    between Plaintiff and Class Members, on the one hand, and Defendants Gameloft and Imangi, on

9    the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal.

10   2023).

11   154. At all relevant times, by its electronic monitoring of the RTB process, Defendant

12   Gravy Analytics willfully and without the consent of all parties to the communication, or in any

13   unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic

14   communications of Plaintiff and Class Members, on the one hand, and Defendants Gameloft and

15   Imangi, on the other, while the electronic communications were in transit or were being sent from

16   or received at any place within California.

17   155. At all relevant times, Defendant Gravy Analytics used or attempted to use the

18   communications it intercepted to promote and improve its service offerings.

19   156. At all relevant times, Defendants Gameloft and Imangi aided, agreed with,

20   employed, permitted, or otherwise enabled Defendant Gravy Analytics to wiretap Plaintiff and

21   Class Members through its electronic monitoring of the RTB process and to accomplish the

22   wrongful conduct at issue here.

23   157. The data made available by Defendants Gameloft and Imangi and illicitly monitored

24   by Defendant Gravy Analytics constitutes "personal information" within the meaning of the

25   CCRA. *See supra.*

26   158. Under the CCRA, "A business that controls the collection of a consumer's personal

27   information shall, at or before the point of collection, inform consumers of… The categories of

28   personal information to be collected and the purposes for which the categories of personal

1 | information are collected or used and whether that information is sold or shared. A business shall

2 | not collect additional categories of personal information or use personal information collected for

3 | additional purposes that are incompatible with the disclosed purpose for which the personal

4 | information was collected without providing the consumer with notice consistent with this

5 | section." CCRA § 1798.100(a)(1).

6 | 159. Thus, Plaintiff and putative class members would reasonably have expected to be

7 | notified, as required by the CCRA, if Defendants intended to sell or otherwise make available

8 | users' locational data to data brokers.

9 | 160. Yet Defendants Gameloft and Imangi never gave the requisite notice required for

10 | collection of Plaintiff and putative class members' PII or geolocation data required under the

11 | CCRA. Plaintiff and putative class members were not informed of the categories of personal

12 | information Defendants Gameloft and Imangi collected, the purposes for which the categories of

13 | personal information are collected or used, whether that information was sold or shared, or the

14 | length of time Defendants Gameloft and Imangi intended to retain each category of personal

15 | information or the criteria used to determine that period. *See* CCRA §§ 1798.100(a)(1), (3).

16 | Indeed, Plaintiff and putative class members were wholly unaware of Defendants Gameloft and

17 | Imangi's sale and transmission of users' data through the RTB process. They were likewise wholly

18 | unaware of Gravy Analytics' monitoring and use of the same.

19 | 161. The wiretapping of Plaintiff and Class Members occurred in California, where

20 | Plaintiff and Class Members accessed the Apps and provided the very geolocation data at issue.

21 | 162. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured

22 | by Defendants' violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each

23 | of Defendants' violations of CIPA § 632(a).

24 | **COUNT III**
**Use of a Pen Register or Trap and Trace Device**

25 | **Cal. Penal Code § 638.51**

26 | 163. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

27 | 164. California Penal Code Section 638.50(b) defines a "pen register" as "a device or

28 |

1    process that records or decodes dialing, routing, addressing, or signaling information transmitted
2    by an instrument or facility from which a wire or electronic communication is transmitted, but not
3    the contents of a communication."

4        165.    California Penal Code Section 638.51 prohibits any person from using a pen register
5    without a court order.

6        166.    Defendants' aforementioned collection of the PII was via a "pen register" because it
7    is a device or process that records addressing or signaling information—Plaintiff and Class
8    Members' location data and personal information—from the electronic communications
9    transmitted by their smartphones.

10       167.    Defendants were not authorized by any court order to use a pen register to track
11   Plaintiff's and Class Members' location data and personal information.

12       168.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class
13   Members suffered losses and were damaged in an amount to be determined at trial.

**COUNT IV**
**Unjust Enrichment**

16       169.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

17       170.    Plaintiff and members of the Class conferred a benefit on Defendants through the
18   use and dissemination of Plaintiff's and Class Members' personal information, geolocation data,
19   and communications.

20       171.    Defendants received and are in possession of Plaintiff's and Class Members'
21   personal information, geolocation data, and communications, which Defendants used and
22   disseminated for their own monetary benefit.

23       172.    It is unjust under the circumstances for Defendants to retain the benefit conferred by
24   Plaintiff and Class members without compensating them.

**REQUEST FOR RELIEF**

26       WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek
27   judgment against Defendants, as follows:

28

(a) For an order certifying the Class and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel;

(b) For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: May 2, 2025

**BURSOR & FISHER, P.A.**

By: _____
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
Andrew Obergfell (*pro hac vice* forthcoming)
Matthew A. Girardi (*pro hac vice* forthcoming)
Julian C. Diamond (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: pfraietta@bursor.com
aobergfell@bursor.com
mgirardi@bursor.com
jdiamond@bursor.com

*Attorneys for Plaintiff*